

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

March 6, 2025

**BY ECF**
The Honorable Denise L. Cote
United States District Court Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      **Re:** *United States v. Federico Hernandez Gamboa*, 24 Cr. 686 (DLC)

Dear Judge Cote:

      The Government respectfully submits this letter in advance of sentencing in the above-captioned case, which is scheduled for March 7, 2025. The defendant, Federico Hernandez Gamboa, faces a United States Sentencing Guidelines ("Guidelines" or "U.S.S.G") range of 30 to 37 months' imprisonment after having pled guilty pursuant to a plea agreement to conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349. For the reasons set forth below, the Government submits that a sentence within the Guidelines range is warranted.

      **I.    Background and Offense Conduct**

      For approximately three years, the defendant participated in a conspiracy to induce elderly victims to send wire transfers to bank accounts that were purportedly controlled by operators of a sweepstakes lottery but were in fact controlled by the defendant and other co-conspirators. (Presentence Investigation Report "PSR" ¶ 12). In connection with the sweepstakes lottery fraud scheme (the "Fraud Scheme"), four victims (the "Victims") were made to believe that they had been the winners of various sweepstakes lotteries and, in order to obtain their winnings, were induced to send collectively approximately $4.3 million in fraud proceeds to bank accounts that were controlled by the defendant or his co-conspirators, approximately $664,000 of which were sent directly to bank accounts that were controlled by the defendant. (*Id.*).

      One of the Victims ("Victim-1") was 67 years old when he was induced to send, in total, approximately $800,000 to the defendant and his-coconspirators. (*Id.* ¶¶ 14-26, 46). The defendant's co-conspirators told Victim-1 that Victim-1 was the first-place winner in a sweepstakes lottery and would receive approximately $1,950,000 once Victim-1 wired money for certain fees. (*Id.* ¶¶ 14-26). In perpetuating the Fraud Scheme, the defendant's co-conspirators impersonated sweepstakes lottery personnel, as well as high-ranking government officials, including the Chief of the Criminal Division of the United States Attorney's Office for the Southern District of New York, the Deputy Director of the Financial Crimes Enforcement Network, a "lead attorney/special agent" with the United States Attorney's Office for the "Western District of Virginia and Texas,"

and an employee of the United States Department of the Treasury and United States Department of Commerce. (*Id.*). At least approximately $265,000 of the money that Victim-1 wired was sent to bank accounts that were controlled by the defendant. (*Id.* ¶¶ 14, 21). The Probation Office spoke with Victim-1 who reported that he has been "financially and personally devastat[ed]" by the losses he incurred as result of the Fraud Scheme. (*Id.* ¶ 46). As a result, he has had to return to work to attempt to rebuild his savings and retirement funds which were almost entirely depleted as a result of the Fraud Scheme. (*Id.*).

Another one of the Victims ("Victim-2") was 72 years old when he was induced to send, in total, approximately $73,800 to the defendant and his co-conspirators, nearly all of which Victim-2 sent to bank accounts that were controlled by the defendant. (*Id.* ¶ 27). Members of the Fraud Scheme told Victim-2 that he won an approximately $750,000 prize in a sweepstakes lottery and instructed Victim-2 to send funds to cover certain fees. (*Id.* ¶¶ 27-33). In perpetuating the Fraud Scheme, the defendant's co-conspirators impersonated sweepstakes lottery personnel, as well as an employee of the Consumer Protection Agency and an employee of United Bank Trust. (*Id.*). Victim-2 submitted a victim impact statement[1] which details the "extreme emotional, mental, and physical harm the offense has caused." (*Id.* ¶ 47). Victim-2 stated that the Fraud Scheme has caused irreparable damage to his finances, and that as a result of the fraud, Victim-2 and his wife suffer from escalated blood pressure, anxiety, and the inability ability to trust other human beings. (*Id.*).

A third victim ("Victim-3") was 66 years old when she was induced to send, in total, approximately $3,600,000 to the defendant and his co-conspirators, at least approximately $77,600 of which Victim-3 sent to bank accounts that were controlled by the defendant. (*Id.* ¶¶ 34-35). Members of the Fraud Scheme told Victim-3 that she had won an approximately $8,000,000 prize in a sweepstakes lottery, but that she needed to wire money for purported taxes and fees associated with her lottery winnings. (*Id.* ¶¶ 34-35). In perpetuating the Fraud Scheme, the defendant's co-conspirators impersonated sweepstakes lottery personnel. (*Id.*). At the direction of the sweepstakes lottery impersonator, Victim-3 emailed a copy of her driver's license to the defendant's co-conspirator. (*Id.* ¶ 35). The defendant's iCloud account contained at least four photographs of driver's licenses that contain Victim-3's personal identifying information, but had photographs of four different individuals, none of which depict Victim-3, as well as photographs of a U.S. passport and Massachusetts identification card that contain Victim-3's photograph and personal identifying information. (*Id.* ¶ 36). Vicitm-3 submitted a victim impact statement in which she stated that the Fraud Scheme depleted her life's savings. (*Id.* ¶ 48). As a result of the Fraud Scheme, she cannot retire and has been drained financially, emotionally, and physically. (*Id.*).

The fourth of the Victims ("Victim-4") was 99 years old when he was induced to send, in total, approximately $250,000 to bank accounts that were controlled by the defendant. (*Id.* ¶¶ 37, 49). Members of the Fraud Scheme told Victim-4 that he had won an approximately $11,000,000 sweepstakes lottery and was entitled to an additional $2,700,000, but that he needed to wire money for certain related fees. (*Id.* ¶ 37). In perpetuating the Fraud Scheme, the defendant's co-

---

[1] Attached to this sentencing submission are victim impact statements from Victim-2, Victim-3, and the family of Victim-4.

conspirators impersonated an employee of the United States Department of the Treasury. (*Id.*). Victim-4 is now deceased, but members of his family submitted victim impact statements reporting a total loss of $642,150 derived from $551,881 in payments made to the defendant and his co-conspirators, $65,699 in legal fees incurred by Victim-4's family to prevent further victimization, and $24,570 paid in capital gains taxes by the victim due to liquidating his assets to make the payments requested by members of the Fraud Scheme. (*Id.* ¶ 49). The family members also detailed the emotional toll the fraud had on Victim-4 prior to his death, who was initially convinced that the Fraud Scheme was legitimate, but who suffered great embarrassment and fractured relationships with his family in the last years of his life as he grappled with the deception to which he fell prey. (*Id.*).

On February 9, 2024, the defendant was charged in a four-count complaint with (1) conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349; (2) conspiracy to commit bank fraud, in violation of Title 18, United States Code, Section 1349; (3) bank fraud, in violation of Title 18, United States Code, Sections 1344 and 2; and (4) aggravated identity theft, in violation of Title 18, United States Code, Sections 1028A(a)(1), 1028(A)(b), and 2. (Dkt. No. 1). On December 11, 2024, the defendant waived indictment and pled guilty pursuant to a plea agreement (the "Plea Agreement") to an information charging him with conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349. (Dkt. Nos. 34-37, Minute Entry Dated December 11, 2024). As part of the Plea Agreement, the parties stipulated to a Guidelines calculation of 30 to 37 months' imprisonment based on an offense level of 19 and criminal history category of I, which is consistent with the Probation Office's independent Guidelines calculation. (*Id.* ¶¶ 61, 64).

## II.   Discussion

### A. Applicable Law

The United States Sentencing Guidelines still provide strong guidance to courts following *United States v. Booker*, 543 U.S. 220 (2005). Although the Guidelines are no longer mandatory, because they are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49. After that calculation, a sentencing Judge must consider the seven factors outlined in 18 U.S.C. § 3553(a), which include the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; the defendant's need or rehabilitation; the kinds of sentences available; and the need to avoid unwarranted disparities in the sentences imposed on similarly situated defendants. Ultimately, the Court must impose a sentence that is sufficient, but not greater than necessary, to serve the purposes of sentencing.

### B. A Sentence Within the Guidelines Range of 30 to 37 Months Is Appropriate

The Government respectfully submits that a sentence within the Guidelines range would be sufficient, but not greater than necessary, to serve the purposes of sentencing.

First, this sentence would appropriately account for the nature and circumstances of the offense, in particular, the significant and devastating toll that the defendant's conduct had on the lives of multiple victims and their families. The defendant participated in a sophisticated scheme where he and his co-conspirators deceived vulnerable elderly individuals and plundered their life's savings. As a direct result of the defendant's actions, four elderly victims suffered a collective loss of approximately $4.3 million. But as evidenced from the victim impact statements, the harm was not merely financial. The victims reported "extreme emotional, mental, and physical harm," (PSR ¶ 47), "escalating blood pressure, anxiety, and many sleepless nights," (*id.*), the inability to trust others, (*id.*), anger, humiliation, and helplessness (*id.* ¶ 49), and the breakdown of family relationships (*id.*). The defendant defrauded his victims of their life's savings at a time when they should have been permitted to enjoy the fruits of a lifetime of hard work. He robbed them, not only of millions of dollars, but of peace and dignity during the golden years of their lives. This conduct is reprehensible and warrants significant punishment.

Second, a significant sentence is needed to deter the defendant and protect the public. As the defendant made clear at the time of his guilty plea, he knew that the funds he was receiving had been obtained by fraud and that he agreed with others to exchange those fraudulent funds for cryptocurrency. (*Id.* ¶ 51). The defendant knew what he was doing was wrong. He is highly educated and used his privileges to take advantage of others. As the defendant reported to the Probation Office, he came from a "close-k[]nit family and financially stable household" where he "had access to the best schooling and educational opportunities that were available." (*Id.* ¶ 71). He was the valedictorian of his high school class and obtained a master's degree in information technology, a post master's certificate in business and finance after completing a program offered by Harvard University in partnership with a university in Costa Rica, and a certification in anti-money laundering. (*Id.* ¶¶ 82, 84). Rather than using his privileged education for lawful means, the defendant used it to strip unwitting, vulnerable victims of their life's savings and dignity in the final years of their lives. A significant sentence is warranted to deter the defendant from causing further damage to the public.

Although the Government acknowledges the mitigating factors identified in the defendant's sentencing letter and is particularly moved by his daughters' ongoing support, the defendant's request for a sentence of time served (9 months) falls short of adequately accounting for the gravity of the instant offense. The defendant characterizes his role in the offense as simply "ignor[ing] [] red flags," (Def. at 8), and argues that "[a]t no point was any lottery scheme mentioned nor was there a discussion of stolen or fraudulently obtained funds," (*id.* at 4). But the defendant acknowledged in his plea colloquy that he knew that the money he received into his bank account had been obtained by fraud and that even after he knowingly obtained money through fraud, he took steps to exchange those fraudulent funds for cryptocurrency for other members of the Fraud Scheme, for which he received a cut. (*See* Plea Tr. 20:12-24; *see also id.* at 17:21-18:7). Moreover, in his iCloud account, the defendant possessed multiple photographs of driver's licenses that contain Victim-3's personal identifying information, but had photographs of four different

individuals, none of which depict Victim-3. (PSR ¶ 36). He also possessed photographs of a U.S. passport and Massachusetts identification card that contain Victim-3's photograph and personal identifying information. (*Id.*). There is no reason—and no legitimate excuse—for the defendant to possess obviously fraudulent documents other than for fraudulent purposes. Further, while the defendant suggests that the fact that he has been financially responsible for his family for years should mitigate in favor of a light sentence, part of that financial support has come at the expense of the Victims in this case, all of whom directed a portion of their savings to the defendant's own bank accounts. Although his role in the Fraud Scheme may have been minor, he was aware that what he was doing was wrong and ultimately is responsible for the loss of hundreds of thousands of dollars of other families' hard-earned assets.[2]

---

[2] The Government acknowledges that the defendant provided an attorney proffer shortly after his arrest. However, because the defendant did not provide full names or other identifying information of his co-conspirators—despite acknowledging that he hired "a private investigator[] to investigate the men that he previously worked with" (Def. at 5) and who he claims successfully dealt with alleged threats that he received from those men—the Government determined that the defendant had not provided substantial assistance.

**III.    Conclusion**

      For the reasons set forth above, a sentence within the Guidelines range of 30 to 37 months' imprisonment[3] would be sufficient but not greater than necessary in this case.[4]

                           Respectfully submitted,

                           MATTHEW PODOLSKY
                         Acting United States Attorney

By:   /s/_____
       Amanda C. Weingarten
       Assistant United States Attorney
       (212) 637-2257

---

[3] In light of recent Second Circuit decisions, the Government respectfully requests that, for each special condition of supervised release that the Court intends to impose, the Court briefly state its reasons for concluding that each such special condition is "reasonably related" to at least one of the factors set forth in U.S.S.G. § 5D1.3(b). *See, e.g.*, *United States v. Sims*, 92 F.4th 115 (2d Cir. 2024) (vacating special condition and remanding for district court to provide sufficient explanation for imposition of condition); *United States v. Oliveras*, 96 F.4th 298 (2d Cir. 2024) (same); *United States v. Jimenez*, No. 22-1022, 2024 WL 1152535 (2d Cir. Mar. 18, 2024) (summary order) (same).

[4] The defendant again claims that he was extorted while incarcerated. However, as has been previously conveyed to the Court, (Dkt. 40), the Government repeatedly sought to address the defendant's extortion claims but the defendant refused to provide any information regarding his allegations beyond supplying a printout of a Zelle payment allegedly made by the defendant's family. Given the defendant's refusal to provide any additional information, the defendant's extortion claim has not been verified. (*Cf.* PSR ¶ 8).